FONES HARDWARE CO. *v.* ERB.

Decided July 3, 1891.

1. *County bridges—Letting contracts.*

The act approved February 19, 1891, which authorizes the board of bridge
commissioners to advertise that they are ready to receive plans, specifica-
tions and bids for the erection of a county bridge from which they will
adopt a plan and accept the accompanying bid, authorizes a letting
which admits of no competition or comparison of bids, and is to that ex-
tent in conflict with section 16 of article 19 of the constitution, which, in
providing that all contracts for erecting bridges in any county " shall be
given to the lowest responsible bidder," contemplates that, before adver-
tising for bids, a plan should be adopted with specifications, not merely
of a general character, but so definite and detailed as to disclose the thing
to be undertaken with circumstantial fullness and precision.

2. *County contracts—Appropriation.*

The board of commissioners cannot make a contract to build a bridge
which will bind the county unless an appropriation for that purpose has
been previously made by the levying court (Mansf. Dig., sec. 1451); an
appropriation " for preliminary work, estimates, etc., toward securing
such bridge " is not an appropriation to build it.

3. *Injunction—Illegal contract.*

Injunction will lie to restrain the board of commissioners from executing an
illegal contract.

APPEAL from *Pulaski* Chancery Court.

DAVID W. CARROLL, Chancellor.

Suit on behalf of the Fones Brothers Hardware Company
to enjoin Jacob Erb, county judge of Pulaski county, and
C. H. Whittemore and Theo. Hartman, bridge commission-
ers of said county, from executing a contract with the Mis-
souri Valley Bridge Company for the construction of a
county bridge across the Arkansas river at Little Rock.

The complaint alleges in substance that plaintiff, a cor-
poration, is a citizen, resident and tax-payer of Pulaski
county; that the county court of Pulaski county, while
being held by the county judge alone, had appointed com-
missioners to select a site for a bridge across the Arkan-
sas river at Little Rock; that these commissioners had se-
lected as the site for locating and landing said bridge Main

street in Little Rock; that afterwards, without any appropriation ever having been made by the levying court for the construction of such bridge, the county judge, while holding the county court alone, had appointed Hartman and Whittemore as commissioners to contract for the building of said bridge and to procure bids therefor in conjunction with himself; that said judge and commissioners, after adopting general specifications but without ever having adopted a definite plan and detailed specifications, advertised for "sealed proposals, competitive plans and specifications" for the construction of said bridge, a copy of which notice is exhibited; that bids were submitted under this notice by two different bidders; that each bidder bid on a different plan and each bidder bid on several different plans, each bidder furnishing his own plans and specifications, all conforming however to the general specifications which had been adopted by the commissioners; that the Youngstown Bridge Company, a responsible contractor, had furnished a plan and specifications conforming to the commissioners' general specifications, and had bid and offered to build said bridge for $218,000; that the Missouri Valley Bridge Company, by its agent, A. J. Tullock, had submitted a plan and specifications, also conforming to the commissioners' specifications, and upon their plan said Missouri Valley Bridge Company, hereinafter called the Missouri Company, bid and offered to build said bridge for $258,000; that said commissioners had resolved that the Missouri Company's bid of $258,000 was lower than the Youngstown Bridge Company's bid of $218,000, and had formally so reported to the county court, and had recommended a contract to be made with the Missouri Company for the building of said bridge at the price of $258,000; and that the county judge and said commissioners, without any appropriation having been made therefor, were about to sign up a written contract on behalf of the county with said company for the construction of said bridge at said price of $258,000, and would do so unless restrained by an injunction; that there had been oth r

bidders on the ground, and that some of them would have agreed and offered to build the identical bridge proposed to be built by the Missouri Company for less than $258,000, but that they had no opportunity to see, and could not there-fore bid upon, the particular plan and specifications furnished and bid upon by the Missouri Company. Plaintiff further alleged that said bridge was about to be located, and under said contract would be located, landed and constructed on Main street in Little Rock, and that the Missouri Bridge Company and its agent Tullock were about to build, and, unless enjoined, would build said bridge under such contract. Prayer for an injunction to restrain the county judge and the commissioners from executing the contemplated con-tract with the Missouri Company, or from making any con-tract for the building of said bridge without first adopting a definite plan and detailed specifications and letting the con-tract to the lowest bidder, or from making any contract touching said bridge until an appropriation therefor shall have been made.

Plaintiff moved for a temporary restraining order. On this motion affidavits and counter affidavits were filed. A demurrer to the complaint was sustained. Plaintiff ap-pealed.

The following is the advertisement calling for bids, plans, and specifications :

" PROPOSALS FOR THE CONSTRUCTION OF HIGHWAY BRIDGE OVER THE ARKANSAS RIVER AT LITTLE ROCK, ARK.

" Sealed proposals, competitive plans and specifications, will be received up to noon, April 7, 1891, for the construc-tion of a foot, highway and street railroad bridge to be built by Pulaski county, Arkansas, over the Arkansas river, at the foot of Main street, in the city of Little Rock. Pro-posals must be sent by mail, indorsed ' Proposals for Arkan-sas River Bridge,' and addressed to Hon. Jacob Erb, County Judge, Little Rock, Ark. They must be accompanied by a certified bank check for $5000. All plans must comply strictly with general specifications furnished by the county.

The county reserves the right to reject any or all bids.  For profile and plans of river and other information, apply to F. W. Gibb, commissioner of roads and bridges, Little Rock, Ark.

"J. ERB, *County Judge.*

"T. HARTMAN,

"And C. H. WHITTEMORE,

"*Commissioners.*

"Little Rock, Ark., March 3, 1891."

*J. M. Moore* and *W. S. McCain*, for appellant.

1.  No contract can be let for the building of a bridge of the first class before an appropriation is made for the purpose.  An appropriation for preliminary work, surveys, soundings, etc., is not sufficient.  Sec. 1451, Mansf. Dig.; *ib.*, secs. 1443–5, 5600–3, 1449–50; *ib.*, 499 etc.; 34 Ark., 356 ; 36 *id.*, 641 ; 40 *id.*, 549–50; 34 *id.*, 307 ; 98 U. S., 104, 114 ; *ib.*, 395 ; 105 *id.*, 735 ; 88 N. C., 489 ; 12 Mich., 279 ; 42 N. W. Rep., 363 ; 75 N. Y., 72.

2.  The act of 1891 violates art. 19, sec. 16, Const.  4 Neb , 150; 21 Ohio St., 322; 33 Barb., 515 ; 121 N. Y., 631 ; 85 Pa. St., 379.

3.  Injunction was the proper remedy.  13 Ark., 198 ; 51 *id.*, 235 ; 43 *id.*, 119; Mills, Em. Dom., 130; 82 Mo., 367 ; 31 *id.*, 181; 50 Ark., 466;  10 Wall., 497 ; 45 Ia., 23 ; Const., art. 16, sec. 13 ; High on Injunction, 1251 ; 24 N. E. Rep., 366 ; 29 A. & E. Corp. C., 424 ; 34 Ark., 607 ; 38 *id.*, 462 ; 53 *id.*, 205 ; 51 Ind., 266 ; 55 Ind., 30 ; 13 Ill., 618. Appellant had no other remedy.  53 Ark., 287.

*G. W. Caruth* and *U. M. & G. B. Rose* for appellees.

1.  Art. 7, sec. 30, const., prescribes the jurisdiction of the quorum court; the legislature can neither add to nor take from it.  6 Ark., 75 ; 22 *id.*, 384;  49 *id.*, 160;  12 *id.*, 101 ; 7 *id.*, 262, etc., 32 *id.*, 497.

2.  The law relating to bridges is not involved in the sections limiting contracts made by the county courts.  Mansf. Dig., secs., 497 to 503 ; Acts of 1891 ; 2 Dillon, 253.

3. As there *has been* an appropriation for the bridge, which was partly unexpended, the contract is valid.  Acts 1875, p. 53; Acts 1879, p. 115; Mansf. Dig., 1451; 6 McLean, 113; 36 Ohio St., 409; Endlich, Int. St., 352.

4. In case of important public works, no injunction should issue unless a plain case is made for relief.   13 Ark., 212; 21 Fed. Rep., 261; High, Inj., sec. 34.

HEMINGWAY, J.   This appeal presents for determination three questions:  First—When a board of commissioners for building a bridge across a stream more than 400 feet wide have advertised for and received bids with competitive plans and specifications, can it adopt a plan and specifications thus received and accept the accompanying bid? Second—Can such board make a contract for building a bridge before any appropriation therefor has been made, or when there is an unexpended appropriation " for preliminary work, estimates, etc., toward securing such bridge?" Third—If such board is about to make such a contract, will a court of equity, at the suit of a tax-payer of the county, interfere by injunction?

1. If the first question could be determined by the provisions of the act of February 19, 1891, our response would be, that the board was authorized to adopt a plan and specifications submitted in response to such notice, and to accept the accompanying bid.   But it is insisted for the appellant that this act is unconstitutional, because it contravenes section 16, art. 19, of the constitution of the State, which is in the following words: "All contracts for erecting or repairing public buildings or bridges in any county, or for materials therefor, or for providing for the care and keeping of paupers where there are no almshouses, shall be given to the lowest responsible bidder under such regulations as may be provided by law."

1. Letting contracts for building county bridges.

The point made is, that the act does not admit of competitive bidding in awarding contracts, and provides a plan

by which the lowest bidder cannot be ascertained, or the giving of contracts confined to such bidder.

The constitutional provision was designed to secure economy in the line of public improvements to which it relates. Extravagance therein might arise either from the inattention or incompetency of the contracting officer, and his consequent failure to obtain favorable offers for contracts; or it might arise from the corruption or favoritism of such officer and his consequent refusal to accept favorable offers when made. To prevent extravagance from the first source the plan of public letting is adopted, the public are informed of contracts to be let, and its self-interest and rivalry are appealed to for proper offers upon them; to prevent extravagance from the latter source all discretion is withheld from the contracting officer, he is bound to give the contract to the lowest bidder, and cannot let it out for individual gain or as a reward to another. The method prescribed is well understood, clearly defined and of distinctive character, specially adapting it to a conservation of public interests. It embodies three vital principles—an offering to the public, an opportunity for competition and a basis for an exact comparison of bids; and any statutory regulation of the matter which excludes or ignores either principle destroys the distinctive character of the system and thwarts the purpose of its adoption. Any arrangement which excludes competition prevents a letting to the lowest bidder; and it does not matter that such an arrangement maintains the form of public letting; if it excludes the essential principle of competition, there can be no real public letting. This is recognized as so essential, that in some cases, where all the forms were preserved, but the contracts to be let were according to plans protected by a patent and the subject of a monopoly, it was held that such contracts could not be made because the monopoly prevented competition. 1 Dillon on Mun. Corp., sec. 467, and cases cited.

When a contract to build a bridge is to be let, there are two kinds of competition that may arise :   First, that between persons desiring to build different kinds of bridges ;. and second, that between those desiring to build the same kind.   And as was said by Judge Christiancy in discussing a provision similar to that under consideration, the bidding which it contemplates is of the latter kind—bidding for the same particular thing to be done according to the same specifications.   For, says he, no bids for different kinds of work, and referring to different specifications, could be recognized as coming in competition with each other, for the purpose of determining the lowest bid, within the requirement of this section, without opening the door to the same corrupt combinations, and furnishing facilities for the same fraudulent practices, which it was the purpose of this provision to prevent.   *Attorney General* v. *Detroit,* 26 Mich., 263.   As the competition contemplated is that between those desiring to do the same particular thing according to the same specifications, it is obviously essential that an opportunity should be given all persons to enter into competition for the specific thing which is the subject of the letting ; and such opportunity cannot be afforded, unless the specific thing to be let has been determined upon and made known.   The constitution contains no express provision with regard to plans and specifications, but the requirement of an award to the lowest bidder implies the further requirement that such information shall be put within the reach of bidders as will enable them to understand the offering and bid intelligently, and enable the representatives of the county to know who is the lowest bidder.   *Detroit* v. *Circuit Judge,* 79 Mich.,. 384.   There can be no intelligent bidding for a contract unless all bidders may know what the contract is ; and this cannot be known unless the plan of the work to be contracted for and the specifications according to which it is to be done have been adopted, for they, with the price to be agreed upon, go to make up the contract.

In the case of *Boren* v. *Darke County*, 21 Ohio St., 311, the Supreme Court of Ohio held, under a statute embodying the provisions of our constitution, that a bid could not be entertained which contemplated work or material not included in the plans and specifications according to which the contract was offered. This ruling was placed upon two grounds: First, that it could not be known who was the lowest bidder; and second, that the contract thus bid for had not been submitted to competition.

In the case of *People* v. *Commissioners*, 4 Neb., 150, the Supreme Court of Nebraska, considering the question upon a similar provision, ruled that, from the necessity of the case, plans and specifications must be adopted in advance of the offering as a basis upon which bids are to be made, and that where county commissioners advertised for plans and specifications with accompanying bids, they could not adopt plans and specifications and accept a bid thus received, because no opportunity had been given for competitive bidding, and no basis had been fixed on which to make bids.

In the case of *Bigler* v. *The Mayor*, 5 Abb., N. C., 51, an action was brought upon a contract with a city to recover the price of lumber furnished, and the recovery was resisted on the ground that the contract was invalid because it had not been let to the lowest bidder. The advertisement was for bids to furnish nine different kinds of timber during the term of one year, specifying each kind of timber, but not specifying the quality of either or the aggregate. The court said in regard to the proposal for bids: "We find, in regard to this contract, that there were no plans and specifications as required by the provisions of the dock law, that the contract was general in every particular, that there was no way in which there could be competetive bidding, for the reason that we find no amount is specified; certain qualities of timber are specified, but there are no quantities, no amount of any kind specified, so that there could be a comparison of bids. If the contract system is to prevail, * * * it is necessary the contract should be

in such a form that there shall be what is called competitive bidding." Illustrating the opportunities afforded for favoritism and fraud where contracts are offered upon indefinite plans and specifications, the court continuing says: "He (the favored bidder) puts a high price upon that· of which they want a good deal, and a very low price upon that which they want very little of; and another man bids conscientiously—supposing they want an equal quantity of the same character, and puts reasonable prices to each class of lumber, and he averages his prices accordingly. How are you going to compare those bids? You foot up so many pieces at so much per thousand, and you will find that the one will be lower than the other. When it comes to be filled, the first will be found to be an infinite degree higher than the other, a fact which would be known to the officers of the department in consequence of their knowing how the work will be carried on, and what proportion of timber of the various classes would be furnished." The court concludes that, without specifications—as to quality and quantity—of the various things to be furnished, there could be neither competitive bidding nor comparison of bids. *Ib.*, p. 70.

An act of the New York assembly provided that every bidder for canal work should accompany his bid with a bond conditioned that, if the contract should be awarded him, he would within ten days enter into a contract for the performance of the work, upon the terms prescribed by the contracting board. The Supreme Court held that the terms of such contracts should be prescribed by the board before the bidding and could not be afterwards. *People* v. *Contracting Board*, 33 Barb., 510.

The charter of the city of St. Paul provided that contracts for paving the streets should be let to the lowest bidder upon notice of the time and place of letting. A notice called for proposals for two contracts for paving different parts of a street. A bid was offered and accepted for paving the entire street under one contract. In a suit upon the

·contract made in pursuance thereof, the Supreme Court of Minnesota said : " No bids were asked for such a contract as the one made with the plaintiff, and, the contract let not being the same that was advertised, the acts of the city or ward officers in making it were void, and created no liability ·on part of the defendant. *Nash* v. *City*, 11 Minn., 174.

We are constrained to believe that the rule announced in that case is the rule fixed by our constitution, and that the contracts made must be the same as those advertised for letting. When it is determined to build a bridge within a given ·time, and the location, plans and specifications have been adopted, all the terms of the contract are fixed except the price to be paid; the obligation to build a bridge according to the terms thus fixed is the thing to be offered to com- ·petition; and until it is formulated by the defining of those terms so that they, in connection with the bid to be thereafter accepted, will comprise a complete contract, there is nothing to be let and nothing to which competition can be directed. It is idle to talk of competition where the minds of bidders are not directed to the thing offered. When the subject of competition is undefined and uncertain, and left to be moulded by the various competitors, it will assume as many forms as they have conceptions, and each will bid upon the thing of his own creation—a thing upon which no other can bid. But the absence of competition is not the only difficulty, for when all bids are upon different things or the same thing differently fashioned, there is no basis on which to compare them or by which it can be determined with certainty which is the lowest bid, and such determina- ·tion must rest in the discretion of the contracting board; but since the constitution was designed to withhold all discretion in such matters, and thereby remove all opportunities for fraud or favoritism, any system which devolves such discretion is in violation of its provisions. It demands in the letting of contracts a basis upon which bids can be compared with mathematical precision, and which leaves nothing to official discretion after the bids are received; and no

act which provides regulations for letting without this basis can stand.

If different plans and specifications were adopted and bids invited at the same time for contracts according to each, whether the board could compare the bids upon the different plans submitted, and accept the lowest bid upon the plan then selected, is a question not raised or considered. See *Attorney General* v. *Detroit*, 26 Mich., *supra*. We only decide that no contracting officer or tribunal has any authority to make a contract for building a bridge unless the same contract, in every material respect, had been submitted to public bidding, and that this requires that it should be submitted with reference to definite plans and specifications. Such being the meaning and effect of the constitutional provision, is the act of the legislature void in so far as it provides that the board of commissioners shall advertise at the same time for plans, specifications and bids, and afterwards adopt a plan and specifications and accept a bid thus obtained? Upon an examination of the statutes it will be seen that, when the act under consideration was passed, the laws in relation to bridges, as well as county buildings, authorized the advertisement for proposals only after the adoption of plans and specifications. A simultaneous advertisement for all was first brought into the statute by the act under consideration. See Mansf. Dig., secs. 499, 1098. This act preserves the form of a public letting; but for what or upon what basis are bids invited? The commissioners are not required to advertise for bids upon a basis fixed by them, but each bidder is invited to define a basis for his own bid. It is plain that no two bids will be made upon the same basis unless by accident, and that there can be no competition among bidders; and when the bids are received, there is no standard by which to measure them, and therefore no means by which it can be absolutely known which is the lowest. In this respect we think the effect of the act would be to nullify the constitution, and it cannot be sustained.

Construing the complaint according to the established rules of construction in this State, we think it is sufficiently alleged that the board of commissioners advertised for bids on a contract the terms of which had not been defined by the adoption of plans and specifications, and that, as the thing to be let was not defined, bidders could not compete with each other in the letting.   According to those allegations, which are admitted to be true by demurrer, there was nothing to submit to the competition of bidders, no letting to the lowest bidder was possible, and the steps taken would not authorize the county court to make a contract or order one to be made, and its action in that regard would be without jurisdiction and void.

We have not overlooked the allegation that the board had adopted what it denominated "general specifications;" but it appears from the advertisement by the board, which is exhibited with the complaint, that the board invited proposals and competitive plans and specifications at the same time, stating that all plans must comply with the general specifications furnished by the county.   It thus appears that the specifications adopted were general and not definite. "General specifications" were not sufficient, but it was essential that such definite and detailed specifications accompany the offering as would disclose the thing to be undertaken with circumstantial fullness and precision.

The building of a bridge according to "general specifications" might be carried forward with such variety of detail and circumstances as to affect very materially its proper cost; and every bidder should know, not only the general plan, but every particular of detail and circumstance which could affect the cost of the work or the advantages of the contract.   This is necessary, not only to active and intelligent competition among bidders, but also to a certain and proper comparison of bids.   An advertisement for bids for building a bridge 500 feet long, 30 feet wide and of a stated capacity of burden would contain "general specifications"— if the words are not so repugnant as to make the term

meaningless. If, in response to this notice, bids with definite plans and specifications were returned, A might offer to build a pontoon bridge at one price, B a suspension bridge at another price, and C a bridge on piers at another, and each bid might "comply with the general specifications," yet there could have been no competition among bidders, and there would be no basis by which to determine with certainty who was the lowest bidder. This supposes an extreme case, but the same conditions must arise—modified only in degree—wherever the plans and specifications adopted are so general as to admit of any substantial variety of detail in their observance.

As there is nothing else in the act of 1891 inhibited by the constitution, its remaining provisions may stand, and must be held to be the law. Cooley, Const. Lim., secs. 210–11; *State* v. *Marsh*, 37 Ark., 356.

2. Upon the second question stated, the appellant relies on a section of the act of March 19, 1879 (Mansf. Dig., sec. 1451), which is as follows: "No county court or agent of any county shall hereafter make any contract on behalf of the county unless an appropriation has been previously made therefor and is wholly or in part unexpended." It is contended that this act has no application to contracts for bridges. According to its terms, it applies to any and all contracts that can be made by the county court or an agent of the county; and it is a part of the act which provides for levying taxes and appropriating revenues for building bridges. We think its language and connection both imply that it was intended to regulate such contracts.

2. An appropriation must be made before letting county contracts.

It was urged in the argument that the constitution conferred the jurisdiction of bridges on the county court, and that if this act was intended to apply to contracts for bridges, it would be void as interfering with the constitutional jurisdiction of that court. We hardly think that much reliance was placed on this ground, and a little consideration discloses its weakness. If the act is void for this reason in its application to contracts for bridges, it is void in all respects,

S C—42

for the jurisdiction of the county court is co-extensive with the matters to which such contracts could relate. But the constitution does not confer on the county court unlimited power in regard to bridges; it only vests in that court the exclusive jurisdiction to administer the law on that subject; and so long as this is permitted, there is no room for complaint. Moreover, the clause which prescribes that such contracts shall be given to the lowest bidder provides that they shall be made under such regulations as may be provided by law (Const., sec. 16, art. 19); and the validity of a statutory regulation similar to, but more restrictive than, the one under consideration was affirmed by this court in the case of *Lawrence Co.* v. *Coffman,* 36 Ark., 641. We think the act applicable in making contracts for bridges, and further that a contract to build a bridge is not authorized by an appropriation for " preliminary work, estimates, etc., towards securing such bridge." It is the policy of the act to require the concurring judgment of the levying court and of the county judge that a bridge should be built, before a contract for building it can be made. When the levying court makes an appropriation to pay for one, that signifies its favorable judgment; and the county judge may afterwards signify his by letting the contract. But we do not think the appropriation relied on signifies the favorable judgment of the levying court; it is more reasonable to conclude that it was made with a view to reaching a decision than as the announcement of one reached. Under the statute then in force, an examination of sites and a procurement of plans and specifications were preliminaries to making a contract, and they were no doubt intended in the designation of the appropriation. Soundings and surveys would be necessary to determine whether it would be practicable to build at any desirable site, and plans and specifications would be needed in estimating the probable cost of the work. We think, from the designation of the appropriation, that it was intended to defray the cost of obtaining

that information, and it might lead to an appropriation for building the bridge or to a determination to abandon it.

While we think a contract can not be made before there has been an appropriation for it, we do not think that when an appropriation has been made, the contract will be limited to the amount appropriated. When the levying court appropriate any sum for the work, that signifies their judgment that the work should be done; and the county judge may then proceed to contract for it without further consulting them, the only limitations upon his power being found in other directions.

3. The ground of complaint in this case was, not that the contract would be inexpedient. or unjust, or that it would involve an extravagant outlay, but that it was about to be made without authority of law. So made, it would be void, and could not properly create a charge upon the taxable property of the county. If the contract should be made and the bridge built, its cost would either be paid by taxation, or the contractor would sustain a heavy loss. Such a contingency would necessarily occasion injurious embarrassment, confusion and contention to the county, the taxpayers and the contractor, which would have been avoided by suit before the complications arose. We can not say that the appellants could have obtained adequate relief by *certiorari*, for the want of jurisdiction arises from matter *dehors* the record. The remedy by appeal is inadequate, for the law does not give the tax-payer his day in court or provide that he may appeal without it. Since the remedy at law is not adequate and complete, we are of opinion that injunction is the proper remedy. *Worthen* v. *Roots*, 34 Ark., 356; 2 High on Inj., sec. 1251, and cases cited.

3. Injunction to restrain letting of illegal contract.

If the views herein expressed are correct, it follows that the Chancellor erred in sustaining the demurrer to the complaint. · The judgment will be reversed, and the cause remanded with directions to overrule the demurrer and for further proceedings.